OPINION OF THE COURT
Marion T. McNulty, J.
This proceeding was commenced by the plaintiff by an order to show cause dated April 6, 2001. The plaintiff requested leave to relocate with the infant children to the State of Florida, and additionally, for a modification of the previously entered judgment of divorce concerning the defendant’s visitation.
The parties were divorced by a judgment of this court entered November 28, 2000 (McNulty, J.). The judgment of divorce was subsequent to a stipulation of settlement placed on the record *391 before this court on June 8, 2000. The judgment provided inter alia that the defendant pay support to the plaintiff on behalf of the children in the amount of $300 per week. Further, the defendant was ordered to pay $100 per week as his contribution toward child care expenses, and in addition, the amount of $43 per month for medical insurance costs for the children. When the stipulation settling the matrimonial action was entered into, the defendant was in arrears of approximately $19,000 as a result of failing to comply with the pendente lite order of the court. In the summer of 2001, just prior to the commencement of the instant hearing, the plaintiff petitioned the Family Court for a contempt finding. Ultimately, as a result of a proceeding before the Family Court (Lehman, J.), arrears then owing were fixed at $11,200 as of July 13, 2001. The defendant made a payment of $10,000 toward the arrears,[1] and the Family Court ordered that the defendant pay $100 per week for 12 weeks toward the arrears in addition to the $400 ordered in the judgment of divorce, for a total payment for 12 weeks of $500. The plaintiff and defendant entered into an agreement in open court in the Family Court wherein the defendant agreed that his total payment to the plaintiff would be that amount until the arrears were satisfied and that thereafter the payment would revert to $400, the amount originally ordered by the Supreme Court in the judgment of divorce. This same order of the Family Court ordered that the defendant pay the fixed sum of $215 for unreimbursed medical insurance premiums on or before August 13, 2001.
The plaintiff testified that she earns $30.81 per hour as a nurse at North Shore University Hospital. While her gross salary is $2,100 bi-weekly, she takes home about $1,700. Her expenses each month are about $4,300, inclusive of rental expense for the two-bedroom apartment she shares with the parties’ two sons and on a part-time basis the live-in nanny. She indicated that her father used to give her $300 per week toward the salary of the nanny, but the plaintiff needed a car, so he pays that expense for her instead. Since the cost of the car and insurance is about $480 per month, the plaintiffs expenses are about $3,800 per month. The defendant pays her $220 bi-weekly, for a total of $440 per month toward his $1,200 per month obligation. The plaintiff attested that she never received the $500 per week as ordered by Judge Lehman, nor *392 did she receive the money designated as unreimbursed medical expenses ($215).
As of the commencement of this hearing, the defendant was in arrears of $7,800.[2] On November 20, 2001, during this hearing, the defendant gave the plaintiff a check toward arrears in the amount of $5,000.
If she were permitted to relocate to Florida, the plaintiff would be able to live with her parents in their new condominium. According to her description, the condominium is very large and the boys will each have their own room. The school district into which she would move is in Pinellas County and is considered a “school of excellence.” Nikko and Hunter are very close to their grandparents, particularly their grandfather, who they call “Gomminitz” (phonetic spelling), because when the children were little, Hunter could not pronounce “grandpa.” They developed their close relationship with their grandfather during the parties’ divorce when he would regularly travel up from Florida to provide child care for them while the plaintiff was working or in court.
The plaintiff was originally licensed as a nurse in the State of Florida and stated that there is a huge need for nurses there because of the geriatric population of the state. She actually made an application with a company and was accepted as an employee if she relocates. She was offered $30 per hour in addition to a sign-on bonus. According to her testimony, she was offered an $800 moving grant and the company would pay her electric bill. Her schedule would be three days on duty and four days off duty with an obligation to work every other weekend.
The plaintiff admitted that she continues to be angry with the defendant. She further acknowledged that she is always making disparaging remarks to third persons, including sending negative e-mail messages to his former high school classmates (in anticipation of his high school reunion) as well as his friends. She hoped that the Internet communications to his friends would shame and convince him into believing that he is a “deadbeat dad” and, as a result, he would recognize his obligation to pay the support he owes her for the children.
On cross-examination, the plaintiff readily stated that her anger at the defendant arises from his attitude before and *393 since the divorce. She argues that he lives like a “single” person, owning jet skis, having a $400 hair weave, belonging to a health club and driving a luxury sport utility vehicle ostensibly owned by his mother. He takes the boys for $30 haircuts and then pays much less than he is required to by the judgment of divorce.
For the most part, the children seem happy when they see the defendant. Sometimes they get upset because he is late picking them up and they do not have a number where he can be reached by telephone. There have been occasions when they have waited long periods of time for him to arrive and when he has failed to arrive or has come very late, they have not wanted to leave with him. The children are signed up for various activities and often the plaintiff has to provide their transportation, even on the defendant’s visitation dates, because he does not arrive on time to get them to their activity promptly. It is the argument of the plaintiff that the defendant often takes the children for visitation and then leaves them with his mother or others while he goes to work or socializes.
Admittedly, according to the plaintiff’s testimony, the children and their father have a loving relationship and he has only missed a few visitations that she could testify to during the hearing.
During his testimony, the defendant admitted that he was the subject of an enforcement petition in the Family Court and that he was incarcerated for a short period by the Family Court Judge. He acknowledges that he made an agreement in June 2000 to settle the divorce action knowing that he could not meet even a court-ordered obligation. He stated that he agreed to pay the support as ordered because the continuation of the trial was “costing my family a lot of money.”
The defendant testified that the men’s clothing store where he works is owned by his father in Oceanside, New York. Most days it is not open until after noon. He is paid his salary in cash for working six days per week for a total of 35 hours. He has done nothing to augment the $300 per week paid to him by his father. The defendant claimed during his testimony that he had started a “training” program at New York Affordable, an investment, development and real estate firm, “sometime during the summer.” He has been training to sell their “product.” He will be paid on commission for real estate sales as well as sales of New York Affordable’s investment products. He attends “training” on Tuesdays and he is not paid for attending these “training” sessions which are held in New Jersey.
*394 When the defendant is with the children they go bicycle riding, fishing, visit the firehouse, do puzzles, go to the park, read, and watch videos. Hunter’s favorite book is “Green Eggs and Ham” and his favorite videos are “Thomas the Tank Engine” and “Star Wars: The Next Episode.” Nikko has a short attention span, but he likes to do artwork. They all play together with toys he keeps at his mother’s home. They ride quads and bicycles. Saturday morning they get baths. He “styles” their hair for them every weekend. He insists that they go to bed at 9:00 p.m. The defendant asserts that in the last two years he has not picked up the boys for visitation and then dropped them off at his mother’s house while he, himself, socialized with his friends but without the boys.
The defendant averred that the boys are “my world” and that he has to do “whatever it takes to keep my kids here.” The Support Collection Unit (SCU) presently has a garnishee against his salary for $220 bi-weekly, which is the maximum amount SCU can take.
In resolving this question of relocation, the court has attempted to carefully weigh all the above facts, as well as others contained in the hearing record. The ultimate inquiry which must be made by the court has been determined by the Court of Appeals. In reaching the within determination, the court considers not only the landmark decision of Tropea v Tropea (87 NY2d 727 [1996]), but also the cases which, for many years, have guided the trial courts in determining what is in the best interests of the subject infants in relocation proceedings (Fried-erwitzer v Friederwitzer, 55 NY2d 89 [1982]; Eschbach v Esch-bach, 56 NY2d 167 [1982]; Porges v Porges, 63 AD2d 712 [2d Dept 1978]). Tropea clearly altered the standards which had for many years been the criteria upon which the courts would rely in these most difficult cases. No longer does the court need to determine whether the relocation is necessary, but whether it is in the best interests of the infant(s) who will be relocated. The standard of best interests, along with economic or other necessities as secondary considerations, is to be considered as the primary criteria upon which courts must base relocation decisions.
“Other considerations that may have a bearing in particular cases are the good faith of the parents in requesting or opposing the move, the child’s respective attachments to the custodial and noncustodial parent, the possibility of devising a visitation schedule that will enable the noncustodial parent *395 to maintain a meaningful parent-child relationship, the quality of the life-style that the child would have if the proposed move were permitted or denied, the negative impact, if any, from continued or exacerbated hostility between the custodial and noncustodial parents, and the effect that the move may have on any extended family relationships.” CTropea at 740.)
This case presents a most difficult decision for the court. Failure to pay ordered child support, in and of itself, should not be the determinant issue in a relocation application. However, the matter before the court presents an extreme circumstance which dictates that the court carefully consider whether, in this instance, failure to comply with the conditions of the stipulation and judgment of divorce permits the court to find that it is in the best interests of the children that their mother be permitted to relocate with them to the State of Florida.
There is no question in the court’s mind that the application of the plaintiff to relocate is made in good faith. The court’s observation of the plaintiff since the inception of this matter as a matrimonial action has been that she is a hard-working, caring and loving mother who has always put her children’s needs above her own. She has worked as a nurse to support herself and the children since at least early in the year 2000. She has made all arrangements for child care and has paid for said child care with no assistance from the defendant. She has attended all the children’s school meetings and has seen to their physical health, while the defendant has never been to a parent-teacher meeting and only recently, since the inception of this proceeding, has he taken the boys to their pediatrician. Throughout the matrimonial action and this application, the plaintiff has argued that the defendant has continually failed to meet his financial obligations to the children and the court agrees.
The defendant, in spite of his continuous failure to comply with the court’s orders, appears to sincerely love his children. His testimony is that he will do anything to keep them in the New York area and that is the crux of this case.
The relationship of the plaintiff and the defendant is defined by the defendant’s failure to meet his financial obligations to the plaintiff and his children. The plaintiff admittedly has made and even up until the time of trial, continues to make disparaging remarks to the defendant’s friends concerning the *396 defendant’s failure to meet his commitments to her and the children. On the other hand, the defendant has continued to live what can euphemistically be described as a “singles lifestyle,” flaunting expensive clothing, cars, recreational equipment and other indicia before the plaintiff and the children, all the while completely defying this court’s orders. This is no way for the children to perceive their parents, and yet, this has been the only way these two young and innocent boys áre influenced — by a father who will not support them and a mother who despises their father.
The court believes the plaintiff’s testimony that she simply cannot live on Long Island, even working as a full-time nurse. The court finds that her testimony concerning her expenses is credible and completely believable. She candidly admitted her hostility to the defendant concerning the financial issues.
The defendant is a liar and a cheat. These are the harshest words this writer has used in 14 years on the bench. While the court usually opines that a person “lacks credibility” or that their testimony is “specious at best” due to the fact that the parties’ testimony in these cases cannot be completely resolved by comparative scrutiny, such is not so in the instant matter. When the defendant expressed — under oath — that he would do whatever he had to do to keep his children here, he meant it in the worst possible way! During the course of this hearing, he admitted that he consented to a stipulation which included a child support order to settle the divorce action (which had already commenced trial) which he knew he could not meet.[3] His excuse: that he had to end the trial because his family had already paid substantial sums for him to pursue the case. During this hearing, the defendant also proffered $5,000 toward arrears to the plaintiff. The source of this money: his friend Chris — who, the defendant admitted, would never be repaid, and who had no idea that the defendant had appropriated the *397 funds never even intending to make good on the loan, in spite of the agreement the defendant claims he made with him. During this hearing, the defendant admitted that he made a representation to the Family Court that he would pay $500 per week for 12 weeks, after paying a lump sum of $10,000 to “get out of jail” in order to stay out of jail. The unrebutted testimony during this trial is that he did not pay any of the amount due to purge his contempt before Judge Lehman.
It is clear that the defendant will say or do anything if it is beneficial to him — anything, that is, except seek employment other than that which his father provides for him. Despite the specter of the court’s considering permitting his children to relocate with their mother, the defendant continues to work six days a week for his father for the paltry sum of $300 per week. He has defiantly refused to seek additional employment in any area of expertise. The court, on numerous occasions suggested that he “sling hamburgers at McDonald’s” or “heft boxes at Mary’s,” not to be facetious, but in an apparently vain attempt to persuade the defendant that his course of action could no longer be tolerated by the court. His intractable attitude is considered by the court to be contumacious and shows a lack of respect for the authority of this court and the Family Court.
In light of all the circumstances of this case, the court verily believes, in light of the unique and unusual facts of this case, that failure to support the subject infant children is of such an extreme nature as to warrant the court’s finding that it is in the best interests of the children that they be permitted to relocate with their mother to the State of Florida. Their standard of living will improve, they will live with relatives who will provide financial, emotional and moral support for them and their mother will be better able to provide for them in spite of the defendant’s unwarranted refusal to support them in accord with not only the court’s orders, but his own swom-to agreements.
Again, taking into account the unusual circumstances of this court’s permitting the within relocation petition, it is imperative that the court fashion a visitation agreement which will permit viable contact between the defendant and his sons. Unless the parties agree, in writing, otherwise, the minimum visitation to be afforded to the defendant shall be as follows:
1. Within each calendar month (that is, between the first day of the month and the last day of that month), the defendant, at his expense, may transport the children to New York for a weekend visitation period commencing on Friday at a time as *398 soon after the children’s school day ends as is possible and ending with the return of the children to the airport nearest their mother’s residence, or any other airport she may designate no later than 8:00 p.m. on Sunday evening. On any weekend which the defendant chooses which is followed by a Monday holiday on which the children are not required to attend school, the visitation shall be extended until 7:00 p.m. on Monday evening;
2. Between the first of July and the thirty-first of August in each year, the defendant, at his expense, shall transport the children to New York for a period of no less than five consecutive weeks of uninterrupted visitation. There shall be no other periods of visitation in the summer between the children and the defendant save for these five weeks, i.e., no weekend visitations. Likewise, the plaintiff may not serve as camp nurse at any camp which the children may attend while they are with the defendant for the summer visitation period. If the parties mutually determine that the visitation should not be a period of five consecutive weeks, visitation shall be calculated in such a fashion that the plaintiff is guaranteed at least two consecutive weeks with the children, uninterrupted by visitation with the defendant;[4]
3. In even numbered years, the defendant’s monthly visitation shall include a period which incorporates Christmas Eve and Christmas Day and the week thereafter, with the children being returned to an airport of the plaintiff’s choosing no later than 4:00 p.m. on the day before the commencement of school in the children’s home school district; in odd numbered years, the defendant’s monthly visitation shall include a period which incorporates Thanksgiving Eve through the Sunday after Thanksgiving as well as the Thursday before Easter through 4:00 p.m. of the day before the commencement of school in the children’s home school district at the end of the “Easter” break. If the children are afforded a “mid-winter” break, said period of time shall always be with the defendant and said visitation shall commence on the afternoon of the last day of school before the break and the children shall be returned to an airport of the plaintiffs choosing no later than 4:00 p.m. on the day before the commencement of school in the children’s home school district;
*399 4. Unless Mother’s Day is superceded by the Easter holiday, the plaintiff shall have Mother’s Day with the children each year and the Father’s Day holiday shall be with the defendant at his choice;
5. The parties shall fix the schedule for each six-month period no later than May 1 of each year for the period July through December and no later than November 1 of each year for the period January through June;
6. On 48-hour notice to the plaintiff, the defendant may visit with the children in the State of Florida, and the plaintiff is ordered to make the children available for nonovernight visitation during the school week, and overnight visitation on weekends, with the children being returned to the plaintiffs home at times mutually convenient to the parties and the children.
The court has taken into consideration all testimony properly adduced during this proceeding as well as all appropriately proffered arguments as set forth in the parties’ memoranda of law. The court has considered the recommendation of the Law Guardian that the plaintiff be permitted to relocate with the children, and while not obligated to follow said recommendation, has taken it into account in determining what is in the children’s best interests. The court has applied the pertinent case law to the facts as it believes is just and fair. The court has not and will not take into consideration any arguments which are raised pertinent to matters dehors the record.[5]

. The defendant testified that Judge Lehman incarcerated him for several hours that day and that he paid $10,000 and agreed to pay the $500 per week.

. It should be noted that this hearing commenced on November 19, 2001. The order of Judge Lehman was dated and entered August 17, 2001, memorializing an agreement placed on the record on July 13, 2001.

. In every matter concluded by agreement or stipulation in this court, this writer conducts an extensive allocution to determine whether or not the parties to the stipulation understand it, whether or not they have consulted with their attorneys concerning the agreement and whether or not they “agree to abide by and comply with the conditions” of the stipulation or agreement “which has just been placed on the record.” This court conducts this inquiry in order to make its own determination that the parties are knowingly and voluntarily entering into the agreement. In no case where either of the parties has vacillated in their acquiescence to the agreement has the court permitted the settlement of the action, and certainly, if the court suspected that either of the parties were acting disingenuously, would never permit the parties to agree to the settlement. This case is no exception.

. If the visitation is split into separate periods rather than one five-week period, then the plaintiff shall bear the expense of the children’s round trip tickets for one visitation period if the children travel by air or other common carrier.

. Both counsel engaged in posttrial communication with the court asking that information be considered by the court which was dehors the record. It should be made clear that the court neither considered nor allowed said communications to influence its decision in this case. Both counsel are known to this court as skilled advocates and, as such, are presumed to “know better” than to engage in this type of litigation.